Good morning, ladies and gentlemen. Please be seated. Good morning, Judge Gould. Can you hear us okay? Yes, yes, I can hear you. Good morning. Okay, great. As welcome to the Ninth Circuit, Judges Gould and I welcome our colleague Judge Boo from Missouri, who is sitting with us on assignment. Welcome. Thank you. And just a few housekeeping matters. Judge Gould is appearing by video. He is actually our presiding judge in this case, but because I'm physically in front of you, I'm going to call the matters and I'll just preside for purposes of this court hearing. So I will call the matters as they are listed on the calendar. And beside each of your designations, you have a time amount. And generally speaking, I will keep you to the time. If you are the appellant, that means the time that you're given is the full time, including any time you wish to reserve for rebuttal. It's your responsibility as the appellant to keep track of the time. But I'm looking right at the clock, so if when you approach the podium, you tell me that you want to aspirationally reserve some time for rebuttal, I will try to remind you when you get to that particular point. However, I'm sure as you can understand, when the clock runs out, if you are answering a question of one of the judges, please feel free to finish answering the question. And if any of my colleagues have additional questions and we take you over time, please, even if it's a hard question, you can't say, oh, the time's up and run back to your chair. You have to answer the questions because we want to have all our questions answered to decide the case. I know that a few of you have indicated that you want to split time, and so when I call the case, before we start the clock running, I'll clarify how we'll handle that at the podium. So the first matter on calendar for today is Eric Swallow versus William Torgren, case number 18-16051. And it's my understanding on this case that, okay, I see more than one counsel at both tables, but I think it was indicated to me that counsel for the defendants want to split their time. Okay, and so that's Andrea Austin and Maureen Harrington, and you have ten minutes total, so you each want five minutes. Is that correct? Counsel for the appellant, or is it just one person arguing in that? Yes, ma'am. Okay, great. One of the things that I want to explain, when you split time, I see it sometimes that the person that goes second starts getting very stressed out, thinking because you only have ten minutes total and if you're splitting five and five. All right, if you are the first person arguing, if you've used the time, I'm going to stop you so that your other person gets five minutes' time. So don't worry. If you're the second person, I'll handle it. You'll get your five minutes. If we are asking the first person additional questions, don't be concerned because I won't let that cut into the second person's time. Anytime we're asking additional questions, that's on my clock, not on your clock. So we can go ahead and proceed and begin then. Thank you. Good morning. Good morning. My name is William Cohan. I'm here on behalf of Plaintiff Appellant Eric Swallow. With me at counsel table is John Houston Scott. We're grateful for the opportunity to present oral argument to the court this morning. I hope you say that after you're done, after we ask you all the questions, that you're still having as much fun. Well, we'll see. I would like to reserve two minutes for rebuttal, if I may. Okay. Go ahead. Thank you. So this morning I want to discuss events that took place after the dismissal of this complaint. But before I do that, I want to talk about Noah Pennington immunity and prosecutorial immunity and the error by the district court in dismissing our complaint under Rule 12b-6 without leave to amend. Specifically, with respect to the activities of Mr. Torngren, which are not prosecutorial functions. The district court conflated things that were done by Mr. Torngren, which were not prosecutorial, with prosecutorial functions. For example, the conspiracy into which he entered months prior to the accusation is not a prosecutorial function. At most it could be characterized as an investigative function. Then during the course of the accusation being pursued after it was filed, I would respectfully invite the court's attention to Exhibit 10. Exhibit 10 is a so-called letter of intent in which Mr. Torngren and the Lenardys attempted to force Mr. Swaller to sell not only his shares in GCI, Garden City Incorporated, the corporation at issue here, to the Lenardys. Well, it has to be more. All right, prosecutors don't always do what the other parties want them to do. All right. So it's got to be more than not doing what you want someone to do if you're alleging that if. . . So what functions are you saying were outside the. . . Does Mr. . . . Does the prosecutor. . . Did the prosecutor know the people before it started? Well, he certainly knew them once he started conspiring with them to extract almost $14 million from Mr. Swallow after forcing the sale. But first he tried to force a sale to the Lenardys, which is not a prosecutorial function. All right, but he doesn't get any of the money, right? Well, actually, this is an interesting point. We pointed out that the monies that are collected through fines and penalties go to a fund, a fund that is maintained exclusively for the maintenance of the commission and the bureau for their operations. All right, but that's not a personal fund. That's not a personal fund that's going to the prosecutor's bank account. The prosecutor is not a shareholder, right? Well, actually, the prosecutors and the commissioners who purported to adjudicate this impartially were not really impartial, and that's why we submitted to this court on September 9th under Rule 28J of the Federal Rules of Appellate Procedure supplemental authority from the Fifth Circuit. The Fifth Circuit found a structural fatal flaw to the method by which bail and fines were extracted from defendants in those cases. Well, I understand Mr. Torgren is – I understand that – not Mr. Torgren, but Mr. Swallow is unhappy to an extent because the Lenardys settled, right, and in this particular – they were part of what Torgren was prosecuting. The Lenardys settled, and Mr. Swallow, your client, went through the administrative proceedings, and I don't think that there's any doubt at the end that he ended up having to pay bigger fines and there was more involved. It's not unlike co-defendants, and I think if you probably hang around later, we probably have some cases where there can be many co-defendants. Some plead out before trials. Some are cooperators and testify at trials or whatever, and people get different sentences at the end. So just the fact that there's a disparate resolution at the end doesn't in fact establish a conspiracy, does it? I'm not talking about that. Okay, well, tell me what you're talking about. I'm specifically addressing non-prosecutorial functions, determining who and under what terms Mr. Swallow will sell his shares to. That's not a prosecutorial function. At most, it's a bureau function, and it was extortionate. Furthermore, the conspiracy involved allowing the Lenardys, who were guilty of the same alleged misconduct here, as Mr. Swallow. And the point of this was – and I was going to get to this later, but I'll get to it now in response to Your Honor's question. We learned in May of this year, because the California auditor published a report, that the bureau and the commission are currently enjoying a $90 million surplus in a fund exclusively for their benefit. That's why the cases from the Fifth Circuit are so particularly pertinent here. Furthermore, speaking of non-prosecutorial functions, there is Exhibit 30 that goes into excruciating detail about the interference with Mr. Park's attempt to buy Mr. Swallow's shares. Again, this has nothing to do with a prosecutorial function. At most, it might be a bureau function at some point. But it was no part of the accusation and couldn't have been addressed in the accusation. It has nothing to do with prosecuting, period. Furthermore, even after the license revocation, the Lenardi's stole what turned out to be about $30 million. And Mr. Torngren assisted them in doing that. In fact, long after the license revocation had become final – that's June 26, 2016 – on August the 7th, 2017, Mr. Torngren sent an email to Mr. Swallow's attorney, Mr. Vakili, saying, under no circumstances will the Bureau or the Commission ever allow Mr. Swallow to receive his $30 million that was stolen by the Lenardi's. The excuse that has been proffered is, oh, well, we can't pay an unlicensed person. But back to Exhibit 10, Your Honor. Exhibit 10 is the extortionate attempt to force Eric Swallow to sell his shares for $29 million, which is about 20 percent of their actual fair market value and about half of the distressed value with this extortion going on, the forcing him to sell because of the impending accusation. But this theft of the $30 million is supposedly excused by the fact that Mr. Swallow can't be paid the money because he doesn't have a license. But in Exhibit 10, Mr. Torngren authorized payments for 40 months after Mr. Swallow's license was gone at $500,000 a month. So that excuse is not only not valid, it's fraudulent. Mr. Torngren knew perfectly well that there was no prohibition on those payments being made. Indeed, he authorized those payments being made. And, again, none of these are prosecutorial functions. With respect to the Lenardi's, there's no petitioning activity involved in stealing money and filing false and fraudulent tax returns, regardless of whether you have an agreement from a deputy attorney general. But you look at the events that have taken place after the revocation and see those couldn't possibly be prosecutorial functions. And yet there's Mr. Torngren helping his co-conspirators not only steal $30 million from 2015, 2016, and 2017, but make excuses for them so that they could launder money and use that money to, among other things, pay for Mr. Swallow's shares. I think we have to evaluate this case. We're cutting into your rebuttal time, but I think we have to evaluate your case. What was before the district court, correct? Well, the case law that has evolved is subject to Rule 28J. And the factual developments also include another victim that we've specifically identified, because he's now my client, who was victimized with the same extortionate scheme by which the commission and the Bureau say, oh, the statute that says we can only get $20,000 per violation, that the – actually, the appellees provided the court with the decision on the writ, which held that the construction of the Bureau and the commission was absurd, saying that they could collect almost $14 million when the maximum fine was only $430,000. Those matters, the validity of the revocation, whether due process was violated, whether the fine was, in fact, illegal and extortionate, those matters are currently pending in the California Court of Appeal. Thank you. I would like to reserve a couple minutes for rebuttal. Okay. Thank you. Thank you very much. Good morning. Good morning. Good morning. May it please the Court, I'm Maureen Harrington, the attorney for Janine Lenardi individually and as the successor representative to Pete Lenardi III. As indicated before the argument started, I will be taking five minutes of time, and Ms. Austin, on behalf of Mr. Torngren, will have the remaining five minutes. And we should save questions about Mr. Torngren for your co-counsel. Yes, that would be – Okay, go ahead. Thank you very much. This is a simple shareholder dispute regarding distributions and the actions of officers and directors that properly belongs in state court, where, in fact, it's now pending before the Santa Clara Superior Court. Mr. Swallow's claims, whether they're cast as RICO or 1983 claims, arise out of his claims that he was wrongfully deprived of his gambling license and his shares. Correct me if I'm wrong. The prosecution started out against your clients as well as Mr. Swallow. Is that correct? That is correct. The accusation began in May of 2014, and it named Mr. Swallow, Mr. and Mrs. Lenardi, as well as Garden City, the entity. And my understanding is that if you just compare what Mr. Swallow ended up, what ended up with him, and what ended up with Lenardi's, it's quite disparate in terms of the amount of money that they had to pay, et cetera. Could you respond to that? Yes. Garden City, as well as the Lenardi's, reached a settlement in March of 2015 that was approved by the commission in May of 2015. Mrs. Lenardi paid nothing. Mr. Lenardi paid $250,000. Garden City paid $1.250 million, plus there were additional payments made to recoup the administrative costs that were borne by the Bureau as part of the prosecution. And that was a stipulation that was reached in negotiations with the Bureau, but as with all items reflecting licensure, was ultimately within the province of the commission and had to be approved by the commission. So any settlement that Mr. Torngren was involved in the settlement, correct? Mr. Torngren representing the state, yes, was the negotiating party on their behalf. But any settlement has to ultimately be approved by the commission? That is correct because the settlement was following up on an accusation that was seeking to terminate the licensure of all of the parties that were accused, Mr. Swallow, the Lenardi's, as well as Garden City's own enterprise license. And so for that to be settled, including with the conditions that were imposed on the license by statute, that's exclusively the province of the commission. Factually, it appears that Mr. Swallow went to another, was prepared to sell the shares to another buyer, and that didn't happen, and the Lenardi's exercised some first right of refusal or first right of whatever you call that. It is undisputed that from 2008, there was a contract between the Lenardi's and Mr. Swallow that provided each of the shareholders a right of first refusal. Mr. Swallow entered into a contract with Mr. Park that triggered that right of first refusal, and he did that in April of 2015, long before his administrative hearing even began, long before there was any belief or allegation on his part that there was some ongoing conspiracy. Entering into that contract with Mr. Park then triggered the Lenardi's rights under the buy-sell agreement, again from 2008, far outside any purported conspiracy period. That was for $55 million? Excuse me? Was that for $55 million? His agreement with Mr. Park was for $55 million. The buy-sell agreement gave the Lenardi's the right to buy the shares for the same price that Mr. Swallow chose to accept from a third-party offeror. We then proceeded to not one, but two arbitrations over whether the Lenardi's had a right of first refusal, whether it was properly exercised, and what the terms were by which that sale would be completed. Both of those arbitrations were reduced to judgment. They are now final and binding upon Mr. Swallow. He did not lose his shares as a result of any vast conspiracy. He sold his shares pursuant to a binding final judgment after a full and complete arbitration on the rights of the Lenardi's to purchase. So you're getting down to the last of your time. So is there 30 seconds you want to wrap up? For 30 seconds, Your Honor, I'll quickly take up the tax issue since that's the one that's unique to the Lenardi's. It is undisputed that Garden City is a Subchapter S corporation, and as such, it's a pass-through entity. Whether or not Mr. Swallow gets paid anything, his tax obligations remain the same, and that is undisputed in the law. It's stated in the complaint. And so all the Lenardi's have been doing, all Garden City has been doing, is reporting as a Subchapter S company. And in order for Mr. Swallow to meet the obligations of particularized pleading under Rule 9b, he would have to do a lot more, including explain why, with the impact of the emergency order limiting payments to Mr. Swallow that was binding on Garden City, how there could possibly be a willfully false filing by a Subchapter S entity. Thank you. Thank you. Good morning, Your Honors. Andrea Austin on behalf of Deputy Attorney General William Torgren. I guess I'll take five minutes. All right. Well, you've basically probably, I mean, obviously all of the judges have read the briefs and have some familiarity with the facts. And so you heard the appellant's allegations against why Mr. Torgren should not get absolute immunity as a prosecutor. Can you respond to that? Absolutely. Mr. Swallow has asserted a number of conspiracy theories here that are all cloaked in hyperbole. And when you look at the actual allegations, there are very few facts to them. Specifically, I would address five issues that were raised by Mr. Swallow as outside the scope of, allegedly outside the scope of immunity by Deputy Torgren during Deputy Torgren's prosecution of this action. And those five incidents involve two of which were meeting with potential witnesses, namely Deborah Swallow and Mr. Roberts, who was Mr. Swallow's former IT individual. Those types of functions, meeting with witnesses, preparing witnesses for hearings, fall squarely within the purview of prosecutorial immunity. Well, to clarify, does Mr. Torgren, did he know either of the parties before this started? No. Does he have any financial interest other than that the state does have a fund where people, where they have to pay into? But is there any personal interest? Absolutely not, Your Honor, and there is no factual allegations in the complaint, the First Amendment complaint, that that is the case. In fact, Deputy Torgren was a fairly new deputy to the Attorney General's office prosecuting these actions. So that, there are no facts to support any assertion that there was any collusion or conspiracy or even any knowledge of these people. The complaint alleges that he went beyond what a normal prosecutor would do and negotiated, attempted to negotiate the sale of some of these shares. Is that true? That is absolutely not true, Your Honor. If you look again at, that was one of the third and fourth categories of allegations I was going to get to, and if you look at the facts that underlie those allegations, what you see is a series of communications between counsel, Deputy Torgren, on behalf of the state, with the Lenardi's counsel and Mr. Swallow's counsel regarding both before, during, and after mandatory settlement agreement. So all of the communications with regard to what would happen with the property, with the shares, took place in the context of settlement discussions, and that was not a decision that Mr. Torgren had any final say in, as Ms. Harrington addressed. There were both the right of first refusal, the arbitration agreements, and then ultimately the commission decision. But out of the settlement, it would seem to me that because the Lenardi's agreed to a certain amount, then they did not go forward to the same hearing that Mr. Swallow went forward to. Is that correct? Correct. So that ended essentially their, that resolved, the prosecutor essentially said, okay, if you are willing to pay X, Y, and this and do, and you can, then I'll recommend that you keep your license or whatever, but it ultimately has to be approved. They could have done the same thing as Mr. Swallow's and said, hey, we just want to go to a hearing, we want to roll the dice, and we want to find out, and then ultimately what the commission makes the final decision there? Correct. Absolutely. But he would be the prosecutor in those proceedings? Absolutely. Yes. So he would have, I mean, he was the prosecutor in the initial. So he was prosecuting the Lenardi's as well. Exactly. But they elected to settle, whereas Mr. Swallow elected to fight. Okay, basically your time's up, so wrap it up in a minute. Okay. So in closing, I would just like to point out that the hyperbolic and specious allegations that have been brought against Deputy Tormgren, who is a government attorney simply prosecuting an action that is allowed for by statute, is the exact reason why absolute immunity needs to exist. Thank you so much. All right, thank you. I asked a few additional questions of the other side, so I'm going to give you, I'll give you three minutes for rebuttal. Thank you very much, Your Honor, if I may. First of all, this settlement that we're talking about allowed the Lenardi's to keep their license. Mr. Swallow tried to keep his license, but was told by Mr. Tormgren, oh, no, you're going to have to give up your license and sell your shares to the Lenardi's for $29 million. Not only that, you should sell them your interest in the real estate for $5 million as well, which has nothing to do with the prosecutorial function. By the way, the real estate's worth $50 million, and Mr. Swallow still owns that real estate. I don't think you can talk about a disproportion here. This is not a disproportion. This is the difference between a firecracker and a nuclear weapon. These folks over here agreed to throw Mr. Swallow under the bus to help the commission collect $15 million when the maximum amount they could have collected was several hundred thousand dollars. They collected about 30 times the maximum and did what a Superior Court judge called absurdly construist statute by saying that fines that are limited to $20,000 are limited, but penalties are unlimited, even though that flies in the face of the statute and is absurd. But the Lenardi's agreed because they were in a position not only to keep their license, but also to reap a $75 million windfall, while the commission and the Bureau reaped a $15 million windfall, all at Mr. Swallow's expense. And counsel talked about this arbitration process. Well, the problem that the Lenardi's had is they didn't have the money that Mr. Park had. So Mr. Torngren had to help them by delaying, again, not performing a prosecutorial function, but interfering with Park's purchase, so the Lenardi's could come up with the $42 million that they were trying to borrow. But they couldn't do that. Ultimately, they ran out of time. They tried to force Mr. Swallow to pledge his real estate so they could get a loan. And on May the 12th, 2017, the arbitrator said no. Mr. Swallow doesn't have to pledge his real estate so that the Lenardi's can buy his shares. As a result, some people named Tierney had to come into the situation, and they ended up buying 60% of Mr. Swallow's shares and owned 30% of GCI, while the Lenardi's owned 70%. Now, I say the Lenardi's. Mr. Lenardi has passed away. It's Mrs. Lenardi and the Lenardi Trust that has reaped this stupendous, now $100 million windfall because of this $30 million. And counsel said, oh, this can be resolved in state court. No, it can't. Section 7434 is of Title 26, and the tax questions can only be resolved in a federal court. So the court's dismissal, the lower court's dismissal here is clearly erroneous. It's indefensible to say, well, you can't litigate your 7434 claim because you named Lenardi's and you should have named GCI. Well, we could certainly amend to change the defendant to GCI, but GCI was controlled and still is controlled by the Lenardi's. They're the ones who received all the benefits, and they're the ones who should be the defendants. All right. Thank you. Thank you both for your arguments. This matter will stand submitted.
judges: Gould, Callahan, Bough